[ECF No. 146]

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| **BETTY ELLEN CRUMIDY,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**ROBYN WRAMAGE-CAPOROSO, et al.,**<br><br>**Defendants.** | **Civil No. 23-2455 (ESK/EAP)** |

**OPINION**

This matter comes before the Court on the Motion of Defendants Robyn Wramage-Caporoso, James Hollen, Faith Johnson, and Intikhab Ahmad (collectively, the "Executive Staff Defendants"), ECF No. 146 (Defs.' Mot.), to compel the deposition of Milan Hoagland.  Plaintiff Betty Ellen Crumidy, as Guardian of Milan Hoagland, has filed opposition, ECF No. 149 (Pl.'s. Opp.) and a supplemental opposition brief, ECF No. 155 (Pl.'s Supp. Opp.), and the Executive Staff Defendants have filed a reply brief, ECF No. 158 (Defs.' Reply).  The Court now decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1.  For the following reasons, and for good cause shown, the Executive Staff Defendants' Motion is **GRANTED**.

**FACTUAL BACKGROUND**

I.      **Facts in the Complaint**

According to the Complaint, Milan Hoagland ("Hoagland") was involuntarily committed to Trenton Psychiatric Hospital ("TPH") on August 3, 2020.  ECF No. 1 (Compl.) ¶ 41.  This was not Hoagland's first commitment to TPH.  Indeed, in 2019, Hoagland had been transferred to the Ann Klein Forensic Center "due to a pattern of assaultive and aggressive behavior." *Id.*  Plaintiff contends that Hoagland's most recent stay at TPH was fraught with issues of medication non-

compliance and aggressive and assaultive behavior. *Id.* ¶¶ 42-58. Yet, "[d]espite Hoagland's knowingly threatening and dangerous behavior, no interventions or plan of care changes were implemented[.]" *Id.* ¶ 59.

The event precipitating this litigation occurred on May 4, 2021. *Id.* ¶ 60. Hoagland had become irate and confronted Defendant Edith Masaquoi, a Human Service Technician ("HST") at TPH, in the hallway outside his room by grabbing a paper garbage bag out of her hand and ripping it up. *Id.* ¶¶ 11, 60. Masaquoi walked to the Nurses Station, used a key to unlock the door, and entered so she could report Hoagland's behavior to Defendant Love Aboagye, a Charge Nurse at TPH. *Id.* ¶¶ 13, 61. Plaintiff alleges that Aboagye simply instructed Masaquoi to stay in the Nurses Station until Hoagland returned to his room. *Id.* ¶ 61.

Approximately one minute after Masaquoi entered the Nurses Station, Defendant HST Loveday Anyanwu walked into the hallway and approached the Nurses Station with key in hand, about to open the door. *Id.* ¶¶ 12, 62. Hoagland grabbed two garbage bags full of trash and threw them all over the floor in front of the Nurses Station, where Anyanwu was standing. *Id.* ¶ 62. As Anyanwu opened the door, Hoagland "swung his arms several times" in Anyanwu's direction, following him into the Nurses Station. *Id.* ¶ 63. Anyanwu retreated into the Medication Room with blood on his face, at which time Aboagye closed the door, leaving Masaquoi alone in the Nurses Station with an enraged Hoagland, who was throwing everything around. *Id.* ¶ 64.

Seconds after closing the Medication Room door, Aboagye pressed a red button, activating a psychiatric emergency code, and repeatedly attempted to call in the emergency via a wall phone, which was purportedly not working. *Id.* ¶ 65. For the next minute or two, Aboagye and Anyanwu took turns holding the Medication Room door to the Nurses Station shut, while "observing firsthand the chaos unfolding in the Nurses Station." *Id.* ¶ 66. According to Plaintiff, Masaquoi said she "began to bang on the door yelling and screaming for help saying, 'Please help me, he is

2

going to kill me' [but] staff refused to open the door or offer any form of assistance." *Id.* (emphasis omitted).

Approximately one minute after Aboagye pressed the emergency button, Defendant HST Sheila Christophe responded to the scene. *Id.* ¶¶ 14, 68. Christophe, however, unlocked the Nurses Station door and pushed it open, which allowed other patients to rush in and begin to punch and kick Hoagland and strike him with foreign objects. *Id.* ¶¶ 68-69. Plaintiff alleges that Christophe took no action to stop the gang beating but simply stood there and watched for ten seconds before walking back down the hallway. *Id.* ¶¶ 69-70. Masaquoi then exited the Nurses Station without taking any action to stop the gang beating. *Id.* ¶ 71. At that time, Defendant Human Services Assistants ("HSA") Tanysha Fryar and Inesia Bastien arrived in the hallway in response to the psychiatric emergency code, but they never entered the Nurses Station or took any action to stop the gang beating. *Id.* ¶¶ 15-16, 71.

About thirty seconds later, Aboagye opened the Medication Room door and entered the rear of the Nurses Station, at which time the patients stopped beating on Hoagland. *Id.* ¶ 72. Three of the patients left the Nurses Station with Aboagye, leaving only one patient (initials H.A.) inside with Hoagland "convulsing" on the floor. *Id.* Seconds later, Anyanwu walked out of the Medication Room, stepped over Hoagland, and exited the Nurses Station, making no attempt to escort the remaining patient into the hallway, call for help, or tend to Hoagland. *Id.* ¶ 73. Indeed, according to the Complaint, no TPH employee called a medical emergency until a few more minutes elapsed, at which time Aboagye used a working telephone in a different room on the hallway to call "111" within TPH. *Id.* ¶ 74.

Two minutes after the psychiatric emergency code was activated, Defendant Nurse Zachary Walton and Defendant Supervisor of Nursing Abiola Badejo walked down the hallway and stood in the entrance to the Nurses Station, followed by Defendant HST Demetrius Mose. *Id.*

3

¶¶ 17-19, 75.  At that time, patient H.A. picked up a large water cooler and threw it at Hoagland while seven of the aforementioned staff members were standing right by the doorway.  *Id.* ¶ 76. Plaintiff alleges that H.A. then "bashed Hoagland over the head with [the water cooler] nine times over the course of twenty seconds." *Id.* ¶ 77.  Defendant Resident Living Specialist ("RLS") Junior Appolon was the only security staffer to respond.  *Id.* ¶¶ 20, 78.  As Appolon reached the doorway, Mose and Badejo fumbled to open the door, and Appolon stepped in and intercepted H.A.'s tenth strike with the water cooler.  *Id.* ¶ 79.  By that time, Defendant Nurse Kalu Uguru arrived at the scene and walked into the Nurses Station, where Hoagland was alone, facedown, and bleeding on the floor.  *Id.* ¶ 24, 80.  Nurse Uguru, however, provided no medical care to Hoagland.  *Id.* ¶ 80.

The Complaint alleges that a medical emergency was not called until 9:06 or 9:07 p.m. several minutes after Hoagland's critical condition was apparent.  *Id.* ¶ 81.  Among those notified were Defendant Obunike Edokwe, M.D., Defendant Assistant Director of Nursing Marcia Kaplan, and Defendant Assistant Director of Nursing Millicent Anigbogu. *Id.* ¶¶ 31-33, 81.  Other medical emergency calls followed at approximately 9:10 p.m. and 9:12 p.m., at which time other staffers arrived at the scene, including HSA Gregory Turner and Defendant Supervisor of Nursing Vida Addai.  *Id.* ¶¶ 27, 82.  Both Turner and Nurse Ochiora brought crash carts, but no responders used any medical equipment on Hoagland.  *Id.* ¶¶ 82-84.  Around 9:18 p.m., over ten minutes from when he was first notified, Dr. Edokwe finally entered the Nurses Station.  *Id.* ¶ 85.  Around 9:25 p.m., EMS arrived, at which time Dr. Edokwe left the scene.  *Id.* ¶ 87.

Hoagland was admitted to the hospital as a high-level trauma patient and was not discharged until July 22, 2021, having been diagnosed with a severe traumatic brain injury, acute respiratory failure, encephalopathy, and facial lacerations.  *Id.* ¶ 90.  "Upon reentry to TPH, Hoagland required around-the-clock assistance with activities daily living, assorted therapies, and fall and choking precautions." *Id.* ¶ 91.  According to the Complaint, "[h]e was non-ambulatory

and required a soft diet for many months." *Id.* When the Complaint was filed, Hoagland remained at TPH, "legally incapacitated, non-ambulatory, incontinent, pained, forgetful, and confused, with impaired speech and no use of his dominant right hand[.]" *Id.* ¶ 92.

On May 4, 2023, Hoagland, through his legal guardian Betty Ellen Crumidy, filed a Complaint against Defendants Robyn Wramage-Caporoso, James Hollen, Faith Johnson, Timothy Loesch, Intikhab Ahmad, Faiza Zubair, Metty Clark, Edith Masaquoi, Loveday Anyanwu, Love Aboagye, Sheila Christophe, Tanysha Fryar, Inesia Bastien, Zachary Walton, Abiola Badejo, Demetrius Mose, Junior Appolon, Veronica Arkuwollie, Martine Domond, Carmena Jeannot, Kalu Uguru, Lauretta Ketter, Ngozi Ochiora, Vida Addai, Keshia Smith, Takay Foka, Juan Bermudez, Marcia Kaplan, Millicent Anigbogu, and Obunike Edokwe. *See generally id.* The Complaint alleges: (1) violation of Fourteenth Amendment civil rights against the Executive Staff Defendants, *id.* ¶¶ 117-25 (Count I); (2) medical negligence against the Executive Staff Defendants, *id.* ¶¶ 126-29 (Count II); (3) violation of Fourteenth Amendment civil rights against the Medical Defendants,[1] *id.* ¶¶ 130-45 (Count III); (4) medical negligence against the Medical Defendants, *id.* ¶¶ 146-50 (Count IV); and *Monell* claims against the Executive Staff Defendants, *id.* ¶¶ 151-57 (Count V).

## II.    Evidence Regarding Milan Hoagland's Competency

On September 23, 2021, the New Jersey Superior Court, Chancery Division adjudicated Hoagland as incapacitated, noting that he "is unfit and unable to govern himself[] and manage his[] affairs in all areas relating to his person." ECF No. 149-3 (Judgment of Incapacity). Plaintiff

---

[1] The "Medical Defendants" listed in the Complaint include Defendants Edith Masaquoi, Loveday Anyanwu, Love Aboagye, Sheila Christopher, Tanysha Fryar, Inesia Bastien, Zachary Walton, Abiola Badejo, Demetrius Mose, Junior Appolon, Veronica Arkuwollie, Martine Domond, Carmena Jeannot, Kalu Uguru, Lauretta Ketter, Ngozi Ochiora, Vida Addai, Keshia Smith, Takay Foka, Juan Bermudez, Marcia Kaplan, Millicent Anigbogu, Obunike Edokwe, and several John/Jane Doe medical providers and emergency responders.

Crumidy was awarded full guardianship of Hoagland. *Id.* On October 7, 2021, Crumidy was granted Letters of Guardianship by the Mercer County Surrogate's Court to act as Hoagland's Guardian. ECF No. 149-4 (Short Certificate of Guardianship).

Hoagland remained at TPH until August 2, 2024, at which time he was discharged to Complete Care of Hamilton in Passaic, New Jersey. ECF No. 149-5 (TPH Discharge Summary). The Discharge Summary noted that:

> Mr. Milan Hoagland was involved in an intensive physical assault on 05/04/2021 resulting in head trauma and hypoxia secondary to assault resulting in neurocognitive impairment due to hypoxia. He was intubated for approximately two weeks due to respiratory failure secondary to traumatic brain injury. He was admitted to a local hospital from 05/04/2021 to 07/22/2021. He returned from the hospital on 07/22/2021 to Lincoln Unit and he was bedbound at that time needing total care. At present, Mr. Milan Hoagland has progressed very well physically. His overall condition had improved. He had gained a tremendous amount of weight. He is now able to ambulate via wheelchair and walker with the help of physical therapy. He is progressing well with the occupational therapist and can dress himself up. He has been through multiple video swallow study and his diet texture has extremely progressed to regular diet with thin liquids, on hard food and candy. Mr. Hoagland is 6 feet tall and his recent weight is 300 pounds with BMI more than 40. He carried a diagnosis of hypertension, coronary artery disease, vitamin D deficiency, dyslipidemia, constipation, seizure risk secondary to traumatic brain injury, bilateral leg edema and vitamin D deficiency. He has a history of coronary artery disease with 60% to 70% stenosis, ejection fraction 58%, history of pleural effusion and left lobe atelectasis.
>
> * * * *
>
> The patient was seen today afternoon in the team room. He came on the wheelchair. He was appropriately dressed and adequately groomed. When we told him that he is going to be discharged tomorrow morning, he was so happy and smiling. I did not realize any abnormal movement in his extremities. His speech was a spontaneous, normal in rate and tone and he was very loud and joyful that he is going to be discharged from the hospital. His mood was euthymic and smiling. He denied feeling depressed, sad, or anxious. He denied having suicidal or homicidal thoughts, ideas, plan, or intention. His thought process was logical, coherent, and goal oriented. He denied extensive auditory or visual hallucination. He remained alert and oriented.

> At the time of discharge, today, he showed very stable psychiatrically and behaviorally and considered enough to be followed upon outpatient basis. He pledged before his departure to remain compliant with medication and remain non-self-harming and threatening to others. He pledged that he will not attack . . . any other human being here and there. He pledged to keep his follow up appointment with outpatient clinic.

*Id.*

When Hoagland transferred from TPH to Complete Care, Ms. Crumidy was not present. As such, Hoagland signed a ninety-page, single-spaced Admissions Agreement, containing and incorporating twenty-four attachments, not including the appendices. *See* ECF No. 149-7 (Admissions Packet). Since Hoagland's admission, he has been examined by medical professionals. A March 23, 2026 Certification of Domingo Yang, M.D. opined that Hoagland's condition "is essentially unchanged" and that he "continues to lack capacity to govern him/herself and to manage his/her affairs to the same extent and therefore the guardianship should continue unchanged." ECF No. 149-8 (Mar. 23, 2026 Certif. of Examining Professional). A March 23, 2026 assessment from Emily A Banks, MSW, CSW, DRE, stated:

> Resident is a 59-year-old male with a history of traumatic brain injury (TBI), schizoaffective disorder, anxiety disorder, mood disorder and more recently added PTSD. His TBI has resulted in chronic cognitive impairments, most notably short-term memory deficits, decreased problem-solving ability, and reduced executive functioning. He demonstrates significant forgetfulness with limited carryover of information from one day to the next. He frequently repeats questions, has difficulty sequencing tasks, and requires step-by-step instructions for routine activities. Resident often needs repeated verbal cues, reminders, and environmental prompts to initiate and complete daily tasks safely.
>
> Behaviorally, the resident can be responsive and cooperative at times; however, due to the cognitive and emotional effects of his TBI and PTSD, he remains prone to disorganization, reduced impulse control, and occasional frustration when overwhelmed. As a result resident does not have [t]he ability to answer questions truthfully and accurately. He continues to require consistent redirection, reassurance, and structed support throughout the day.

7

> Resident requires extensive assistance with activities of daily living (ADLs).  He is able to ambulate using a walker with standby assist, though he benefits from supervision due to decreased safety awareness related to his cognitive deficits.

ECF No. 149-10 (Banks Ltr.).

Ms. Crumidy has also offered insight into Hoagland's condition.  In her November 18, 2025 "Report of Guardian," she notes that Hoagland partakes in smoking, games, music, and religion.  ECF No. 149-9 (Report of Guardian).  On a scale of one to five, with one being the best, Ms. Crumidy rated Hoagland's physical health, emotional health, intellectual functioning, and living situation as a "two."  *Id.*

During her deposition, Ms. Crumidy testified as to Hoagland's many limitations.  She stated that he is unable to make his own decisions, does not think rationally, forgets things, and lacks sufficient memory to take care of himself.  ECF No. 151, Deposition of Betty Ellen Crumidy ("Crumidy Dep.") at 79:14-80:1.  She indicated that he cannot remember things the way he used to, he cannot make sense of some things, or that they are not logical to him.  *Id.* at 95:24-96:2.  He will often call her every day asking him the same questions, whereas prior to the incident he could remember everything.  *Id.* at 96:3-97:18.  When she asks him a question, he is not always logical with his answers, and he does not speak the way he normally did, although "[i]t's getting better" and she can understand him.  *Id.* at 135:22-136:11; 143:11-21.  She testified that he cannot hold a fork, dial a telephone, write letters, cook for himself, or bathe himself.  *Id.* at 144:3-23.  Generally, she believes "his thinking is off," and his short-term memory is a problem.  *Id.* at 148:11-12, 156:19-21.

Ms. Crumidy, however, also observed some positive improvements.  She explained that when she visits Hoagland, she brings food and sometimes friends or grandkids, and they sit and talk.  *Id.* at 87:24-88:7.  She further testified that he is able to hold a conversation, understands what people are communicating to him, and is able to communicate his own thoughts and feelings.

*Id.* at 88:8-16.  She also takes him on trips outside of the Complete Care facility, where he enjoys visiting the park.  *Id.* at 84:16-24.  Mr. Hoagland feels like he is progressing physically and mentally.  *Id.* at 157:22-158:8.  Ms. Crumidy explained that she has observed improvement in his strength, noting that he could stand up and move out of her car into the wheelchair and vice versa, whereas before he could not even stand up.  *Id.* at 159:6-15; *see also id.* at 89:15-25.  Ms. Crumidy further testified that Hoagland loves socializing, that he is in good spirits, and he is trying hard to get out of the facility.  *Id.* at 159:3-12.  She knows that he enjoys bingo, karaoke, singing, and rapping.  *Id.* at 160:13-161:5.  She explained that he is "understandable" when he speaks and that he can express his ideas and wants.  *Id.* at 161:10-24.

### III.    Procedural Posture

The case has proceeded through an extensive period of discovery.  *See generally* Dkt.  On March 13, 2026, the Executive Staff Defendants filed the current Motion to Compel the deposition of Milan Hoagland.  Defs.' Mot.  Plaintiff has opposed the Motion, Pl.'s Opp. & Pl.'s Supp. Opp., and Defendants filed a reply brief, Defs.' Reply.  The matter is now ripe for resolution.

## DISCUSSION

Federal Rule of Civil Procedure 30(a)(1) provides that a "[a] party may by oral questions, depose any person, including a party, without leave of court except as provided Rule 30(a)(2).  Rule 30(a)(2) states:

> A party must obtain leave of court, and the court must grant leave to the extent consistent with Rule 26(b)(1) and (2):
>
> (A) if the parties have not stipulated to the deposition and:
>
> > (i) the deposition would result in more than 10 depositions being taken under this rule or Rule 31 by the plaintiffs, or by the defendants, or by the third-party defendants;
> >
> > (ii) the deponent has already been deposed in the case; or
> >
> > (iii) the party seeks to take the deposition before the time

9

> specified in Rule 26(d), unless the party certifies in the notice, with supporting facts, that the deponent is expected to leave the United States and be unavailable for examination in this country after that time[.]

Fed. R. Civ. P. 30(a)(2).

Ordinarily, parties in a civil case may depose each other without leave of court. Fed. R. Civ. P. 30(a)(1). But a party or nonparty from whom discovery is requested may obtain a protective order forbidding the requested discovery "for good cause . . . to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1).

> In deciding whether good cause exists for the issuance of a protective order, the court must balance: (1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate or improper purpose; (3) whether disclosure will cause a party embarrassment; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether sharing of information among litigants will promote fairness and efficiency; (6) whether the party seeking to benefit from a protective order is a public entity or official; and (7) whether the case involves issues important to the public.

*Memory Bowl v. N. Pointe Ins. Co.*, 280 F.R.D. 181, 185 (D.N.J. 2012) (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787-88 (3d Cir. 1994)).

"'[I]t is rare for a court to issue a protective order that prohibits a deposition.'" *Forcine Concrete & Constr. Co. v. MS Park Constr. LLC*, No. 23-2024, 2026 WL 754159, at *17 (M.D. Pa. Mar. 17, 2026) (quoting *Brockway v. McCreary*, No. 18-1258, 2019 WL 13551037, at *1 (M.D. Pa. June 12, 2019) (further quotations omitted)); *see also In re Google Litig.*, No. 08-3172, 2011 WL 4985279, at *2 (N.D. Cal. Oct. 19, 2011) ("A party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied." (quotation omitted)); *Naftchi v. N.Y. Univ. Med. Ctr.*, 172 F.R.D. 130, 132 (S.D.N.Y. 1997) ("[I]t is exceedingly difficult to demonstrate an appropriate basis for an order barring the taking of a deposition." (citation omitted)); *Motsinger v. Flynt*, 119 F.R.D. 373, 378 (M.D.N.C. 1988) ("Absent a strong showing

10

of good cause and extraordinary circumstances, a court should not prohibit altogether the taking of a deposition."). "A party moving for such relief bears a heavy burden of demonstrating that subjecting the witness to a deposition 'will work a clearly defined and serious injury.'" *Forcine Concrete*, 2026 WL 754159, at *17 (quoting *Brockway*, 2019 WL 13551037, at *1 (citing *Pansy*, 23 F.3d at 786)).

Here, Plaintiff argues that under New Jersey Rule of Evidence 601,[2] "every person is competent to be a witness unless the court finds that the proposed witness is incapable of expression so as to be understood by the court and any jury, or, the proposed witness is incapable of understanding the duty to tell the truth." Pl.'s Opp. at 7-8 (citing N.J.R.E. 601). Plaintiff contends that "based upon his ongoing cognitive deficits caused by his permanent traumatic brain injury," Hoagland "is incapable of providing competent, responsive, and discoverable testimony at a deposition." *Id.* at 8. Plaintiff further asserts that "[n]ot only would [Hoagland's] testimony be wholly unreliable and thus not reasonably calculated to lead to admissible evidence, but a deposition would potentially jeopardize Milan Hoagland's health or well-being per the findings of Social Worker Emily Banks." *Id.*

Plaintiff's argument conflates Hoagland's competency to testify at trial, as governed by Federal and New Jersey Rules of Evidence 601, with the propriety of taking Hoagland's deposition. At the deposition stage, the question is not whether a witness is competent to provide admissible testimony at trial. Rather, Federal Rule of Civil Procedure 26(b)(1) provides that

---

[2] New Jersey Rule of Evidence 601 states: "[e]very person is competent to be a witness unless (a) the court finds that the proposed witness is incapable of expression so as to be understood by the court and <u>any</u> jury either directly or through interpretation, or (b) the proposed witness is incapable of understanding the duty to tell the truth. . . ." N.J.R.E. 601 (emphasis in original). Although this case is in federal court, Plaintiff argues that Federal Rule of Evidence 601 provides that "in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision." Pl.'s Opp at 7. None of the claims or defenses in this case, however, involve an issue regarding competency. Accordingly, the Federal Rules of Evidence supply the applicable standard.

11

"[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*  Thus, "[t]he mere fact that a party may not be mentally competent to testify is not a sufficient reason to prohibit the other party from taking his deposition." *Dang ex rel. Dang v. Eslinger*, No. 14-37, 2014 WL 3611324, at *2-3 (M.D. Fla. 2014) (citing *Sauer v. Exelon Generation Co.*, 280 F.R.D. 404, 408 (N.D. Ill. 2012); *Fjellman v. Forest Hill Coop*, No. 06-14470, 2007 WL 1806173, at *3 (E.D. Mich. June 21, 2007); *Bucher v. Richardson Hosp. Auth.*, 160 F.R.D. 88, 93 (N.D. Tex. 1994)); *see also Yonko v. City of Upland*, No. 18-2259, 2022 WL 2199943, at *5 (C.D. Cal. 2022) ("The mere fact that [plaintiff] was appointed a conservator, for limited purposes, does not make [plaintiff] legally incompetent to testify[.]").

Here, Plaintiff does not dispute that Hoagland has discoverable personal knowledge of the events underlying this lawsuit.  As such, "[e]ven if [Hoagland's] deposition will not produce admissible testimony, that still would not warrant barring Defendants from taking his deposition." *Dang*, 2014 WL 3611324, at *3.  While Hoagland may ultimately be adjudged incompetent to testify at trial, "his deposition may still lead to the discovery of admissible evidence." *Id.*

Plaintiff has also offered no other basis to justify preclusion of Hoagland's deposition aside from the conclusory statements that Social Worker Emily Banks has found that a deposition "would potentially jeopardize Milan Hoagland's health or well-being[,]" Pl.'s Opp. at 8, and that the deposition is "clearly intended to harass, embarrass, and confuse the witness, not to mention cause an undue burden upon him[,]" *id.* at 9.  Putting aside the fact that Social Worker Banks made no such statement regarding the impact of a deposition on Hoagland's health or well-being, *see*

ECF No. 149-10, Plaintiff's argument lacks evidentiary support. "Protective orders are appropriate only where the party seeking the order show[s] good cause by demonstrating a particular need for protection." *Castellani v. City of Atlantic City*, 102 F. Supp. 3d 657, 666 (D.N.J. 2015) (cleaned up). "'Broad allegations of harm, unsubstantiated by specific examples'" are insufficient to meet this burden. *Id.* (quoting *Glenmede Tr. Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995)); *see also Jennings v. Family Mgmt.*, 201 F.R.D. 272, 275 (D.D.C. 2001) (declining to preclude deposition of plaintiff with dementia and depression based on generalized assertions that she would suffer from physical and psychological stressors). Plaintiff here has not attempted to identify how deposing Hoagland would harm him or to show how such a deposition would impose an undue burden on him. In any event, the Court finds that Defendants' need to prepare a defense in this case—much of which is premised on facts within Hoagland's personal knowledge—outweighs these generalized assertions of harm.

In short, Plaintiff has not met her burden of demonstrating facts that warrant the extraordinary measure of an order prohibiting Hoagland's deposition. While Mr. Hoagland undoubtedly faces numerous physical and mental challenges as a result of his various injuries, Defendants have offered evidence of improvement sufficient to substantiate Hoagland's ability to appear for a deposition. Following the deposition, and to the extent Plaintiff feels she has grounds for doing so, Plaintiff can move to preclude use of that deposition testimony at trial. At this juncture, however, the Court finds no basis to prohibit Hoagland's deposition. Accordingly, Defendants' Motion to Compel is **GRANTED**.

An appropriate Order follows.

s/Elizabeth A. Pascal
ELIZABETH A. PASCAL
United States Magistrate Judge

cc:   Edward S. Kiel, U.S.D.J.

13