**[ECF No. 167]**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| **BETTY ELLEN CRUMIDY,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ROBYN WRAMAGE-CAPOROSO, et al.,**<br><br>**Defendants.** | **Civil No. 23-2455 (ESK/EAP)** |

## OPINION

This matter comes before the Court on the Motion of Plaintiff Betty Ellen Crumidy, as Guardian of Milan Dartanian Hoagland, to Compel Production of Joint Commission Documents, ECF No. 167 (Pl.'s Mot.). Defendants Robyn Wramage-Caporoso, James Hollen, Faith Johnson, and Intikhab Ahmad (collectively, the "Executive Staff Defendants") oppose the motion. ECF No. 180 (Defs.' Opp.) The Court now decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1. For the following reasons, and for good cause shown, Plaintiff's Motion is **GRANTED**.

## RELEVANT FACTUAL BACKGROUND

The current action involves the May 4, 2021 patient-led attack on Plaintiff Milan Hoagland, while Mr. Hoagland was himself a patient at Defendant Trenton Psychiatric Hospital ("TPH"). *See generally* ECF No. 1 (Compl.). On May 4, 2023, Mr. Hoagland, through his legal guardian Plaintiff Betty Ellen Crumidy, filed a Complaint against multiple administrators, employees, and

inmates at TPH, setting forth violations of Mr. Hoagland's civil rights under 42 U.S.C. § 1983, as well as state law claims of medical negligence.[1] *Id.*

Approximately eighteen months after the incident, the Joint Commission on Accreditation of Healthcare Organizations ("Joint Commission" or "JCAHO")—an independent, nonprofit organization that accredits and certifies healthcare organizations and programs in the United States, *see* https://www.jointcommission.org/en-us/about-us (last visited Sept. 1, 2026), archived at https://perma.cc/76UU-BHRK conducted its regularly scheduled triennial survey of TPH. Defs.' Opp. at 2. According to the Executive Staff Defendants, who are administrators at TPH, "[t]he survey relates to Medicaid and Medicare funding and standards the Joint Commission sets for accreditation of hospitals that engage its services." *Id.* The survey evaluates numerous operational areas, including pharmacy services, dietary services, physical plant requirements, proper ventilation, medical records, governing body requirements, language services, emergency generator requirements, and infectious disease practices. *Id.* at 2-3, Ex. 3 (Joint Commission Final Accreditation Report) at 42-45. The survey also evaluates general safety standards, including management of hazardous materials and waste, fire safety systems, patient environment cleanliness, and staff competency. *Id.* at 3, Ex. 3 at 46, 48-50. Defendant Faith Johnson, a TPH executive, testified that none of the Joint Commission's findings or recommended improvements specifically related to the incident involving Mr. Hoagland. *Id.*, Ex. 4 (Dep. of Faith Johnson ("Johnson Dep.")) at 332:5-333:3.

During discovery, Plaintiff sought documents relating to the Joint Commission's survey of TPH. On December 5, 2025, following a status conference, the Court ordered the Executive Staff

---

[1] The facts detailed in Plaintiff's Complaint were set forth at length in the Court's July 8, 2026 Opinion. ECF No. 181 (Op.) at 1-5. For the sake of judicial economy, the Court incorporates them by reference here.

Defendants to "search for and produce the Joint Commission report that covers the date of the incident in May 2021." ECF No. 131 (Order) ¶ 4. The Court further ordered that if the Executive Staff Defendants did not possess the report, they were to request it from the Joint Commission. *Id.* If they remained unable to produce it, Plaintiff was ordered to subpoena the Joint Commission directly. *Id.*

On December 16, 2025, the Executive Staff Defendants produced the JCAHO Report relating to its full event visit of November 15, 2022 through November 22, 2022. *See* Defs.' Opp., Ex. 3. After receiving the November 2022 survey report, Plaintiff nevertheless served a subpoena directly on the Joint Commission on January 14, 2026. Pl.'s Mot., Ex. D (JCAHO Subpoena). The subpoena requested:

> Any and all documents in your possession concerning Trenton Psychiatric Hospital ("TPH"), 100 Sullivan Way, Trenton, NJ 08628, which cover any and all reporting periods beginning May 4, 2016 and continuing through the present. This request includes, but is not limited to, any and all accreditation reports, initial reports, interim reports, final reports, accreditation quality reports, documents or reports relating to surveys conducted at TPH, and/or any and all written communications with TPH during the referenced time period. This request additionally includes, but is not limited to, any and all materials in your possession which in any way whatsoever relates [sic] to the May 4, 2021, incident at TPH, involving assault and injury to Milan Dartanian Hoagland . . . .

*Id.* In a January 20, 2026 letter, the Joint Commission objected to the subpoena in its entirety, relying principally on the Illinois Supreme Court's decision in *Niven v. Siqueira*, 109 Ill.2d 357, 487, 487 N.E.2d 937 (1985), which states that "confidential accreditation survey materials and related records, such as survey reports, any complaints, correspondence, etc., in Joint Commission's possession are privileged and exempt from discovery under the Illinois Medical Studies Act (735 ILSCS 5/8-2101 *et seq.*)." Pl.'s Mot., Ex. E (JCAHO Ltr.).

Thereafter, on January 21, 2026, Plaintiff deposed Defendant James Hollen, the deputy CEO for Operations at TPH on the date of the incident. *Id.* at 3. Mr. Hollen testified that he participated in meetings and working groups responsible for preparing corrective action submissions in response to the Joint Commission's citations. *Id.*, Ex. C (Dep. of James Hollen ("Hollen Dep.")) at 477:18-479:7. According to Mr. Hollen, the working groups prepared and circulated draft corrective action submissions, which were reviewed by the Quality Assurance Director before being submitted to the Joint Commission. *Id.* at 523:11-524:16, 525:12-17. Mr. Hollen indicated that the corrective actions identified during these meetings would be memorialized by an electronic communication to the Joint Commission. *Id.* at 479:8-481:2. He further testified that TPH's submissions remained accessible through the Joint Commission's online portal. *Id.* at 481:24-483:1.

During the February 10, 2026 status conference with the Court, Plaintiff again raised the issue of the outstanding Joint Commission documents and the Joint Commission's denial of the subpoena. *See* Dkt. at Feb. 10, 2026 Minute Entry. Thereafter, the Court issued a Discovery Dispute Order granting Plaintiff leave to file, no later than March 13, 2026, a motion to enforce its subpoena to the Joint Commission. ECF No. 143 (Order) ¶ 3. Plaintiff ultimately decided not to seek enforcement of the subpoena, relying in part on the Joint Commission's citation to *Niven*. Pl.'s Mot. at 4. On February 16, 2026, Plaintiff provided the Joint Commission's January 20, 2026 response to the subpoena to all defense counsel. Pl.'s Mot. at Ex. G (Email regarding JCAHO subpoena).

On March 3, 2026, Plaintiff sent the Executive Staff Defendants a discovery deficiency letter, requesting in part the following:

> As referenced during the deposition transcript of James Hollen at 520:23-525:17 . . . when reviewing the Joint Commission

> unannounced full event of November 15, 2022 through November 22, 2022 . . . please produce all referenced drafts and/or final submissions concerning any areas of improvement, improvement plans, evidence of standards compliance, or any other documents created and/or disseminated during the meetings referred to by Mr. Hollen during his referenced testimony.

Pl.'s Mot. at 4-5 & Ex. H (Pl.'s Mar. 3, 2026 Ltr. Request) at 2. The Executive Staff Defendants responded on April 8, 2026, stating in part, "[w]ith regard to a request for materials on an unannounced JCAHO visit in November 2022, please send me a copy of the response from JCAHO to the January 8, 2026 subpoena you served on it, and a proffer as to why any privileges cited by JCAHO would not apply to this new document request. Once received, I will advise of TPH's position on this new document request." Pl.'s Mot., Ex. I (Executive Defs.' 4/8/26 Ltr.) at 2.

Plaintiff responded two days later, noting that she had already provided the Executive Staff Defendants with the Joint Commission's response to the subpoena. Pl.'s Mot., Ex. J (Pl.'s Apr. 10, 2026 Ltr.) at 1. In her letter, Plaintiff noted that the Executive Staff Defendants had previously produced, without objection, the full report from the Joint Commission's November 2022 visit. She also asserted that "[n]otwithstanding the clear difference in status between JCAHO, as a national evaluator and accreditor of health care organizations, as compared with Trenton Psychiatric Hospital, there is no indication that JCAHO's position as to Plaintiff's Subpoena would afford TPH with the same protections. Relatedly, to the extent TPH had any objections, it is respectfully submitted that same has been waived by way of TPH's voluntary production of the November 2022 JCAHO report." *Id.*

On May 6, 2026, the Executive Staff Defendants responded by stating that "JCAHO's response to your subpoena . . . fully sets forth the privileges that attach to the materials you are seeking." Pl.'s Mot., Ex. K (Executive Staff Defs.' May 6, 2026 Ltr.) at 1. The Executive Staff Defendants continued that, "[t]he Hospital respects and shares the Joint Commission's interest in

protecting the accreditation process. You were provided with the opportunity to address these privileges asserted by JCAHO, and applicable to the materials you are requesting, by filing a motion with the Court by March 13, 2026. . . . You chose not to do so." *Id.* at 2.

Plaintiff raised this issue with the Court during the May 13, 2026 status conference. *See* Dkt. at May 13, 2026 Minute Entry. In accordance with the Court's May 13, 2026 Order, Plaintiff timely filed the current Motion seeking "all documents, drafts, corrective actions, and all other electronically stored information related to corrective actions submitted to the Joint Commission." Pl.'s Mot., Proposed Order. On July 6, 2026, the Executive Staff Defendants filed their opposition. Defs.' Opp. The Motion is fully briefed and ripe for disposition.

**DISCUSSION**

The Executive Staff Defendants oppose the Motion to Compel on two grounds. First, they assert that the requested materials are protected by the self-critical analysis and medical peer review privileges. Defs.' Opp. at 2. Second, they contend that the scope of the documents sought in Plaintiff's Motion is overbroad. *Id.* at 10. The Court addresses each argument in turn.

**I. <u>Whether the Requested Documents Are Privileged</u>**

Under Federal Rule of Civil Procedure 26(b)(1), parties may obtain discovery regarding any nonprivileged matter that is relevant to a party's claim or defense and proportional to the needs of the case. The party claiming a privilege has the burden of establishing that the privilege exists and that it is applicable. *In re Grand Jury Investigation*, 918 F.2d 374, 385 n.15 (3d Cir. 1990) (citations omitted); *Morisky v. Public Serv. Elec. & Gas Co.*, 191 F.R.D. 419, 422 (D.N.J. 2000).

Federal Rule of Evidence 501 governs the existence and scope of privileges applicable to discovery under Rule 26(b)(1). *Morisky*, 191 F.R.D. at 422. In federal-question cases, federal privilege law applies. *Id.* (citing *Harding v. Dana Transport, Inc.*, 914 F. Supp. 1084, 1090 (D.N.J.

1996)). "[W]here, as here, there are both federal and state law claims, federal privileges rather than state privileges apply to all claims." *Maldonado v. N.J. ex rel. Admin. Office of Courts-Probation Div.*, 225 F.R.D. 120, 127 (D.N.J. 2004) (citing *Wei v. Bodner*, 127 F.R.D. 91, 94 (D.N.J. 1989)); *see also Pearson v. Miller*, 211 F.3d 57, 66 (3d Cir. 2000) ("'[W]hen there are federal law claims in a case also presenting state law claims, the federal rule favoring admissibility, rather than any state law privilege, is the controlling rule.'" (quoting *Wm. T. Thompson Co. v. Gen. Nutrition Corp.,* 671 F.2d 100, 104 (3d Cir. 1982)).

Even when state privilege law is not controlling, a federal court can recognize new federal privileges by importing state principles into federal common law. *Pearson*, 211 F.3d at 66. "The general test to be applied in assessing privilege candidates is whether such a privilege 'promotes sufficiently important interests to outweigh the need for probative evidence.'" *Id.* at 67 (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)). "When the policies are considered important enough for the privilege to be applicable to a case in federal court, the privilege is applied as a matter of federal common law. It is not applied as a matter of state privilege law." *Wei*, 127 F.R.D. at 94-95 (citing *Gannet v. First Nat'l State Bank of N.J.*, 546 F.2d 1072, 1076 (3d Cir. 1976)). Nonetheless, "[w]hile federal courts *can*, 'with very limited exceptions, federal courts have generally declined to grant requests for new privileges.'" *CarePoint Litig. Tr. V. RWJ Barnabas Health, Inc.*, No. 22-5421, 2026 WL 309727, at *8 (D.N.J. Feb. 5, 2026) (emphasis in original) (quoting *Pearson*, 211 F.3d at 67)). Privileges "must be strictly construed and accepted 'only to the very limited extent that . . . excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Trammel*, 445 U.S. at 50 (quoting *Elkins v. United States*, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting)).

Against that legal framework, the Court turns to the privileges asserted here. Plaintiff's Motion seeks to compel TPH's production of "all documents, drafts, corrective actions, and all other electronically stored information related to corrective actions submitted to the Joint Commission."[2] Pl.'s Mot., Proposed Order. As noted above, the Executive Staff Defendants claim that such documents are privileged, relying on two separate state privileges: the self-critical analysis privilege, as codified in the New Jersey Patient Safety Act ("PSA), and the medical peer review privilege.

In arguing over the applicability of these privileges to the requested documents, however, neither party begins its analysis with the threshold question governing the dispute: whether federal common law recognizes either privilege. Because this matter raises both federal and state law claims arising under federal question jurisdiction, federal common law—not New Jersey privilege law—controls. Accordingly, the Court begins its analysis there.

A. <u>The Self-Critical Analysis Privilege</u>

The self-critical-analysis privilege is codified in the New Jersey Patient Safety Act ("PSA"), N.J.S.A. 26:2H-12.23 to -12.25, which was enacted "to minimize medical errors that

[2] The Executive Staff Defendants argue that Plaintiff's original March 3, 2026 discovery request letter sought "all referenced drafts and/or final submissions concerning any areas of improvement, improvement plans, evidence of standards compliance, or any other documents created and/or disseminated during the meetings." Defs.' Opp. at 10-11 & Ex. 1. They note, however, that Plaintiff's Motion requests, "production of correction action plans and related materials which were submitted" by TPH to JCAHO during the relevant time period. *Id.* at 10 (citing Pl.'s Mot. at 1). Given that "[P]laintiff's motion is not seeking the same materials as were requested in the March 3, 2026 letter[,]" the Executive Staff Defendants contend that the Motion "should fail on this ground alone." *Id.* at 11. While the Court notes the discrepancy between the language in the body of the Motion and Plaintiff's March 3, 2026 letter to the Executive Staff Defendants, the Court will interpret the Motion as seeking documents, drafts, corrective actions, and all other electronically stored information related to corrective actions submitted to the Joint Commission, as set forth in Plaintiff's proposed order.

could harm patients in hospitals and other health care facilities."[3] *Keyworth v. CareOne at Madison Ave.*, 258 N.J. 359, 363 (2024). "The law imposed new obligations on those facilities for assessing and reporting adverse events and near-misses, and it created an absolute privilege—the self-critical-analysis privilege—to shield certain internal communications from discovery in litigation." *Id.* (citing N.J.S.A. 26:2H-12.25(b), (c), (f), (g)). More specifically, the PSA provides that, "[a]ny documents, materials, or information developed by a health care facility as part of a process of self-critical analysis conducted pursuant to subsection b. of this section concerning preventable events, near-misses, and adverse events, including serious preventable adverse events . . . shall not be: (1) subject to discovery or admissible as evidence or otherwise disclosed in any civil, criminal, or administrative action or proceeding." N.J.S.A. 26:2H-12.25(g)(1). "Thus, the PSA shields specific documents, materials, or information that a health care facility develops as it investigates and evaluates adverse events only during one of three specific processes: 'the operations of the patient or resident safety committee pursuant to N.J.A.C. 8:43E-10.4, the components of a patient or resident safety plan as prescribed by N.J.A.C. 8:43E-10.5, or reporting to regulators under N.J.A.C. 8:43E-10.6.'" *Keyworth*, 258 N.J. at 381 (quoting *C.A. ex rel. Applegrad v. Bentolila*, 219 N.J. 449, 468 (2014)). "'In enacting the PSA, the Legislature aimed to encourage health care workers to openly disclose their observations and concerns and to facilitate professional and administrative staff's self-critical evaluation." *Id.* at 363. "[T]he only

[3] The Executive Staff Defendants' reliance on this privilege is unclear. On one hand, they argue that the common law privilege of self-critical analysis shields the requested materials from discovery. Defs.' Opp. at 2, 7. On the other hand, the Executive Staff Defendants contend that the PSA "has no application to the work of, or interaction with, the Joint Commission." Defs.' Opp. at 1; *see also id.* at 2 ("Ms. Crumidy's reliance on a statute governing reports to the [New Jersey Department of Health] by medical care facilities is inapplicable to the factual background of this case."). The Court surmises that the Executive Staff Defendants rely on the self-critical analysis privilege under New Jersey common law and not as codified in the PSA. However, because the privilege, in either form, is not recognized under federal common law, the Court's analysis does not distinguish between them.

precondition to applying 'the PSA's privilege is whether the hospital performed its self-critical analysis in procedural compliance with N.J.S.A. 26:2H-12.25(b) and its implementing regulations.'" *Id.* at 365 (quoting *Brugaletta v. Garcia*, 234 N.J. 225, 247 (2018)). "'The privilege . . . unconditionally protects the process of self-critical analysis, the analysis's results, and the resulting reports developed by a facility in its compliance with the PSA.'" *Id.* at 384 (quoting *Brugaletta*, 234 N.J. at 247).

The existence of the PSA, however, does not resolve the privilege question presented here. This action contains both federal and state law claims, meaning that federal common law governs the application of privilege. No comparable federal statute exists. *Zoom Imaging, L.P. v. St. Luke's Hosp. & Health Network*, 513 F. Supp. 2d 411, 417 (E.D. Pa. 2007). Accordingly, the existence of the self-critical analysis privilege would have to be imported into federal common law. *See Slaughter v. Nat'l R.R. Passenger Corp.*, No. 10-4203, 2011 WL 780754, at *2 (E.D. Pa. Mar. 4, 2011).

In *Alaska Electrical Pension Fund v. Pharmacia Corp.*, the United States Court of Appeals for the Third Circuit observed in *dicta* that "[t]he self-critical analysis privilege has never been recognized by this Court and we see no reason to recognize it now." 554 F.3d 342, 351 n.12 (3d Cir. 2009) (citation omitted). Since *Alaska Electrical Pension Fund*, courts within the Third Circuit have repeatedly considered and rejected the self-critical analysis privilege. *See, e.g., Bobryk v. Durand Glass Mfg. Co.*, 12-5360, 2013 WL 5604342, at *2-3 (D.N.J. Oct. 11, 2013) (declining to apply the self-critical analysis privilege based on both the Third Circuit's refusal to recognize it and general notion that privileges are not favored under federal law); *Bell v. Lockheed Martin Corp.*, No. 08-6292, 2011 WL 13238270, at *4 (D.N.J. Jan. 31, 2011) (finding that "footnote twelve in *Alaska Electrical Pension Fund* is persuasive authority from the Third Circuit

which calls into question the continuing viability of the self-critical analysis privilege in this Circuit"); *Slaughter*, 2011 WL 780754, at *3-4 (E.D. Pa. Mar. 4, 2011) (declining to recognize the self-critical privilege and noting that "[i]n the wake of the Third Circuit's statement in *Alaska Elec. Pension Fund*, courts within the Third Circuit have consistently declined to apply the self-critical analysis privilege." (citing cases)); *Craig v. Rite Aid Corp.*, No. 08-2317, 2010 WL 5463292, at *4 (M.D. Pa. Dec. 29, 2010) (declining to recognize the self-critical analysis privilege and cautioning against the recognition of new and broadly framed privileges in civil litigation); *Smith v. Life Investors Ins. Co. of Am.*, No. 07-281, 2009 WL 3364933, at *8 (W.D. Pa. Oct. 16, 2009) ("the 'self critical analysis privilege' is not recognized by Pennsylvania or the Third Circuit and does not apply."); *Zoom Imaging, L.P.*, 513 F. Supp. 2d at 416-17 (declining to adopt a self-critical analysis privilege to prevent the discovery of confidential documents produced by an outside consultant for an organizational study of a competing provider's radiological practice); *but see Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, No. 03-6025, 2006 WL 2946469, at *3-8 (D.N.J. Oct. 16, 2006) (recognizing self-critical analysis privilege in case decided before *Alaska Electrical*); *Kopacz v. Del. River & Bay Auth.*, 225 F.R.D. 494, 497-98 (D.N.J. 2004) (same); *Brunt v. Hunterdon Cnty.*, 183 F.R.D. 181, 185-86 (D.N.J. 1998) (finding the self-critical analysis privilege applied in the specific case before the court). Similarly, "[a] majority of other Circuits have . . . declined to recognize the self-critical analysis privilege" as a matter of federal common law. *Bell*, 2011 WL 13238270, at *4 (citing cases from the Fourth, Fifth, Seventh, Ninth, and Tenth Circuits).

In light of this authority, the Court declines to recognize a federal self-critical analysis privilege here. The Third Circuit has expressly questioned the privilege's viability under federal common law, and courts throughout this Circuit have consistently declined to recognize it. Nor

have the Executive Staff Defendants demonstrated that the privilege serves the type of compelling public interest necessary to justify recognition of a new federal common law privilege. Given the "predominate principle that courts seek the truth," *Wei*, 127 F.R.D. at 96 (citing *Herbert v. Lando*, 441 U.S. 153 (1979)), the Court finds that the self-critical analysis privilege does not protect the documents at issue.[4]

B. The Peer Review Privilege

The Executive Staff Defendants alternatively invoke the medical peer review privilege. Defs.' Opp. at 9. That argument fares no better. The peer review privilege exists to "protect certain hospital peer review committees and their members from liability, provided that certain requirements have been met." *Wei*, 127 F.R.D. at 98. New Jersey has codified a limited peer review privilege that generally protects information generated by qualifying utilization review committees. *Id.* (noting that the statute provides that "with some exceptions, information and data obtained by utilization review committees cannot be disclosed") (citing N.J.S.A. 2A:84A-22.8 (Supp. 1988)). The privilege is very limited and applies only to utilization review committees, as defined in the state statute. *Id.*

Like the self-critical analysis privilege, the medical peer review privilege has not been recognized as part of federal common law. Courts within the Third Circuit have "declined to extend the state statutory Peer Review privilege into federal common law, finding that the Third Circuit disfavors privilege, and that the U.S. Congress has considered, but declined to extend, a similar peer-review privilege to federal courts." *Crawford v. Corizon Health, Inc.*, No. 17-113,

[4] Plaintiff contends that the Executive Staff Defendants waived any such privilege by producing the Joint Commission Report to Plaintiff. Pl.'s Mot. at 5. The Executive Staff Defendants respond that the production was made pursuant to a Court Order, ECF No. 131, and does not constitute a waiver of privilege over internal communications addressing issues raised in the JCHAO survey. Defs.' Opp. at 10. Because the Court finds that the claimed privilege does not apply under federal common law, the Court need not resolve the waiver issue.

2018 WL 1863022, at *1 (W.D. Pa. Apr. 18, 2018) (citing *Weiss ex rel. Estate of Weiss v. Cnty. of Chester*, 231 F.R.D. 202, 204-05 (E.D. Pa. 2005)); *see also Ray v. Pinnacle Health Hosps., Inc.*, No. 07-715, 2008 WL 2168899, at *1 (M.D. Pa. May 22, 2008) ("Although every state . . . recognizes some form of medical peer review privilege, no federal court has ever recognized such a privilege under federal law."). Indeed, Congress's decision to enact the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101, *et seq.*, while providing qualified immunity for participants in peer review proceedings, is particularly instructive because Congress chose not to create an evidentiary privilege protecting documents created in the peer review process. *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 201 (3d Cir. 2005); *Singh v. Pocono Med. Ctr.*, No. 09-439, 2010 WL 2521039, at *3-4 (M.D. Pa. June 15, 2010). Thus, "[a]lthough Congress has had two occasions to consider whether to extend the peer review privilege to materials produced by medical peer reviews: once in 1986, when the HCQIA was enacted, and again in 1987 when the statute was amended, Congress declined to do so on both occasions." *Id.*

The Executive Staff Defendants cite no authority recognizing a medical peer review privilege in a federal question case.[5] Nor do they explain why this Court should recognize such a privilege as a matter of federal common law notwithstanding Congress's repeated refusal to do so. Accordingly, the Executive Staff Defendants have failed to carry their burden of establishing that the requested materials are protected by the medical peer review privilege.

---

[5] Proceeding on the assumption that the New Jersey privilege applies in this case, Plaintiff argues that, under the Illinois Supreme Court case of *Niven v. Siqueira*, 487 N.E.2d 937 (Ill. 1985), only materials "in the hands of the Joint Commission" are not discoverable, while the same documents in the hands of the Executive Staff Defendants and TPH are discoverable. Pl.'s Mot. at 8 (citing *Niven*). The Third Circuit, however, expressly rejected this argument, holding that "[t]he bar against discovery runs with the documents or information, not with the organization or individuals who happen to possess the documents or information at any given time." *Armstrong v. Dwyer*, 155 F.3d 211, 220 (3d Cir. 1998).

## II. Whether the Scope of the Document Request Is Too Broad

The Executive Staff Defendants' second argument in opposition to Plaintiff's Motion to Compel posits that, "in light of the broad topics reviewed in a Joint Commission's survey, plaintiff makes no effort to distinguish topics that may be related to [Plaintiff's] claims in this case." Defs.' Opp. at 11. Specifically, the Executive Staff Defendants note that the Joint Commission survey report covers a large variety of topics, including in part: organized dietary services, physical plant requirements, proper ventilation, medical records, governing body requirements, emergency generator requirements, and infectious disease practices. Defs.' Opp. at 2-3 (citing Ex. 3 (JCHAO Table of Contents and Appendix)). They contend that "it is difficult to reconcile" how TPH's plans to address these various issues relate to the incident involving Mr. Hoagland. *Id.* at 11 n.5.

The Executive Staff Defendants' point is well taken. The Court agrees that Plaintiff's request, as presently framed, may encompass documents that are not relevant to the claims or defenses in this litigation, and thus not discoverable under Federal Rule of Civil Procedure 26(b)(1). That issue, however, is not properly before the Court. To date, the Executive Staff Defendants have objected to production solely on the basis of privilege. They have not identified specific categories of documents that they contend fall outside the scope of Rule 26(b)(1). Pl.'s Mot., Ex. K at 1. Nor have the parties met and conferred regarding an appropriately tailored production, as required by Local Civil Rule 37.1(a)(1). The Court expects the parties to meet and confer in good faith to narrow Plaintiff's request to materials that are relevant and proportional to the needs of this case before production occurs.

## CONCLUSION

For all of the foregoing reasons, Plaintiff's Motion to Compel is **GRANTED** with respect to Plaintiff's request for documents, drafts, corrective actions, and all other electronically stored information related to corrective actions submitted to the Joint Commission. Recognizing that the request may encompass materials that are unrelated to the claims at issue, however, the Court will require the parties to meet and confer in good faith within ten (10) days of the date of the accompanying Order to narrow the scope of production before any documents are produced. Within ten (10) days after completing the meet-and-confer process, the Executive Staff Defendants shall produce all responsive documents within the agreed-upon scope. If the parties are unable to agree, they shall promptly advise the Court so that any remaining disputes may be resolved expeditiously.

An appropriate Order follows.

s/Elizabeth A. Pascal
ELIZABETH A. PASCAL
United States Magistrate Judge

cc: Edward S. Kiel, U.S.D.J.